UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 05-10304-GAO

UNITED STATES OF AMERICA,

v.

LUIS ALBERTO LOPEZ et al.,
Defendants

OPINION AND ORDER
December 12, 2007

O'TOOLE, D.J.

The pending second superseding indictment charges the defendants in varying combinations with crimes involving the importation and distribution of heroin and cocaine. Broadly put, the indictment grows out of the investigation of an alleged drug conspiracy to import cocaine and heroin from Colombia into the United States and then to distribute the drugs along the eastern seaboard, including in the Greater Boston area.

This Opinion and Order addresses three related motions. In the first, defendant Pablo Baez moves to suppress the fruits of court-approved federal and state wiretaps, arguing that the affidavits made in support of the wiretap applications omitted material information and that had the omitted information been included, the applications for the wiretaps would have failed to satisfy the "necessity requirement" contained in both 18 U.S.C. § 2518(1)(c) and N.Y. Crim. Proc. Law §§ 700.15(4), 700.20(2)(d). (Dkt. no. 153.) Baez also requests a hearing under Franks v. Delaware, 438 U.S. 154 (1978).[1] Second, defendant Richard Duran brings a separate motion to suppress evidence from the

---

[1] Defendants Julio Cartagena, Alexander Serna, Alberto M. Benval, Ernesto Perez, Sixto Rivera, Victor Vega, Felix Ramirez, and Richard Duran have moved, and have been allowed, to join Baez's

wiretaps as well as all physical evidence seized in the execution of a search warrant at an apartment in Everett, Massachusetts. (Dkt. no. 167.) Finally, defendant Julio Cartagena (also identified in the indictment as Jose A. Mejia) moves for an *in camera* inspection of government agents' handwritten notes. (Dkt. no. 306.) For the following reasons, the several motions are DENIED.

I.   **Background**

The present prosecution grew out of investigations conducted by Drug Enforcement Administration ("DEA") agents in Boston, New York, and Bogota, Colombia, as well as by the Colombian National Police ("CNP"). Special Agent Sean Canavan headed the investigation in New York, which developed information that defendant Luis Lopez was orchestrating the importation of heroin from Colombia into the United States and then delivering the drugs to other wholesalers on the east coast. The New York investigation utilized a variety of investigative techniques, including pen registers, telephone tolls, physical surveillance, and two confidential informants, one of whom was Baez.

Beginning in December 2004, Baez provided information to Special Agent Canavan regarding various drug trafficking operations by persons other than Lopez. Around mid-May 2005, Baez began providing information on Lopez's activities. On June 8, 2005, Baez formally signed an agreement to become a confidential source for the DEA until June 8, 2006. The DEA intended to use him to infiltrate drug trafficking operations and, where feasible, to wear a recording or transmitting device to tape illicit activities of the drug traffickers.

---

motion to suppress and request for a Franks hearing. They have not made separate submissions, but rely on Baez's arguments.

2

On June 22, 2005, two weeks after Baez signed his agreement with the DEA, the New York DEA applied, pursuant to the New York state wiretap statute, for a warrant to eavesdrop on Lopez's cellular telephone number 407-739-8405, relying in part on information supplied by Baez. The warrant was issued, authorizing interception from June 22, 2005 to July 11, 2005. It does not appear that the wiretap was very productive as Lopez seemed to conduct any drug-related conversations on a different phone.

Baez continued to cooperate with DEA agents in New York and provided them with information and surveillance opportunities until October 11, 2005. After that, he ceased contact with the DEA and became unavailable. Special Agent Canavan formally deactivated Baez as a confidential source on November 16, 2005.

Meanwhile, the DEA investigation in Boston, which was headed by Special Agent Jean Drouin, was focusing on the activities of defendant Julio Cartagena, who agents believed was a cocaine and heroin dealer in Massachusetts who obtained drugs from Lopez. As part of the investigation in Boston, again relying in part on information gathered as a result of Baez's cooperation in New York, Special Agent Drouin applied for a warrant to intercept calls on a telephone identified to Cartagena. In addition to Cartagena and Lopez, the targets of the interception were identified in the application as defendant Alberto Benval and three other persons who are not defendants here. The warrant issued, authorizing interception of calls on Cartagena's cellular telephone number 617-642-3867 from September 29, 2005 to October 14, 2005.

Although some information from Baez had been used to support the application for the warrant, as of the date of the application, Baez had not provided the DEA with any information specifically regarding Cartagena. The first time he did so was on October 3, 2005, when he told the

3

DEA that one of Lopez's main distributors in Massachusetts was a Dominican male named "Charlie," which is allegedly an alias of Cartagena.

After the initial wiretap on Cartagena's phone, there were three other Title III warrants issued by this Court: (1) for the period October 20, 2005 to November 7, 2005 for Luis Lopez's cellular telephone number 617-230-5434, (2) for the period November 2, 2005 to November 30, 2005 for Cartagena's cellular telephone number 617-230-1204, and (3) for the period November 18, 2005 to November 30, 2005 for Lopez's cellular telephone number 617-331-2103.

## II.    Baez's Motion to Suppress

Baez moves to suppress evidence obtained through the New York and federal wiretaps on the basis that in each case the government failed to show that there was a need to conduct the proposed electronic eavesdropping, as required by both statutes. 18 U.S.C. § 2518(1)(c); N.Y. Crim. Proc. Law §§ 700.15(4), 700.20(2)(d). He also seeks a hearing of the sort authorized by Franks v. Delaware, 438 U.S. 154 (1978).

As to the New York wiretap, the issue can be summarily disposed of. The government states that it will not offer any evidence obtained as a result of what it calls the "unproductive New York state wiretap," and further states that no information from that wiretap was used in the application for the federal wiretap. In these circumstances, that portion of Baez's motion is moot.

An application for a federal wiretap under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") must include, among other information, a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This is the so-called "necessity requirement." See United States v. Lopez, 300 F.3d 46, 52 (1st Cir.

2002). The necessity requirement ensures that the government will not rush to use wiretaps when other, more routine investigative techniques would suffice. See United States v. Kahn, 415 U.S. 143, 153 n.12 (1974); United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987) ("The basis for the statutory monition is the salutary notion that the sovereign should make a reasonable, good faith effort to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic interception of telephone calls."). "However, the necessity requirement is not tantamount to an exhaustion requirement." Lopez, 300 F.3d at 52.

A court issuing a Title III wiretap "'must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence – to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable.'" United States v. Martinez, 452 F.3d 1, 4 (1st Cir. 2006) (quoting United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986)). A reviewing court, however, does not make a de novo determination of sufficiency as the issuing judge would, but rather "decide[s] if the facts set forth in the application were minimally adequate to support the determination that was made." United States v. Scibelli, 549 F.2d 222, 226 (1st Cir. 1977); see also United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003); United States v. Ashley, 876 F.2d 1069, 1073 (1st Cir.1989) ("The government affidavit is adequate if it satisfies the burden that it indicate a 'reasonable likelihood' that alternative techniques would fail to expose the crime.").

Baez argues that at the time of the application the DEA failed to make full use of an available "normal investigative procedure" – namely, his cooperation as an informant who was close to Lopez. In particular, Baez faults Special Agent Drouin for omitting from his affidavit information indicating the degree of Baez's infiltration into Lopez's organization. Baez argues that from about June into

early October 2005, he was in frequent, often daily, contact with Lopez. As a result, he was able to give the DEA information about specific activities of Lopez and others.

In his affidavit, Special Agent Drouin disclosed Baez's cooperation, identifying him as "Confidential Source of Information No. 2" or "CS-2." In particular, the affidavit disclosed that CS-2 was working with agents "in another state" in exchange for monetary payments and that information from CS-2 had been corroborated through surveillance, public record checks and information received from another confidential source. The affidavit further stated:

> CS-2 personally knows LUIS LOPEZ and knows him to be involved in the importation of heroin into the United States. CS-2 told agents that LOPEZ maintains residences in both New York City and Florida. Law enforcement agents showed CS-2 an arrest booking photograph of LUIS A. LOPEZ which CS-2 positively identified as the person CS-2 knows to be LUIS LOPEZ. Furthermore, agents in this other state have conducted physical surveillance of CS-2 meeting with LOPEZ and have positively identified LUIS LOPEZ through the same arrest booking photograph. . . . Sometime in May/June 2005, LOPEZ spoke to CS-2 about the imminent receipt of multiple kilograms of heroin in New York City. CS-2 was present with LOPEZ when LOPEZ discussed the sale and distribution of a portion of that heroin. In June 2005, CS-2 told law enforcement agents that LOPEZ was currently using cellular telephone number (407) 739-8405. . . . Between June 22, 2005 and July 11, 2005, DEA and other law enforcement agents in New York intercepted LUIS LOPEZ's cellular phone communications pursuant to a New York State wiretap warrant . . . .During these intercepted phone calls, LOPEZ indicated to a number of individuals that he (LOPEZ) preferred to discuss what appeared to [be] drug related business on a second cellular phone which LOPEZ referred to as the "blue phone."

(Aff. in Supp. of Application for Authorization to Intercept Wire Communications ¶ 25-28, Sept. 29, 2005 [hereinafter "Sept. 29, 2005 Aff."].)

The affidavit further disclosed that Lopez had been intercepted by the CNP using the "blue phone" to speak with a man in Colombia about delivering furniture to the United States. The CNP, the affidavit disclosed, were investigating "an organization that is believed to be responsible for the

6

importation of hundreds of kilograms of heroin into the United States which is hidden in bulk shipments of furniture." (Id. at ¶ 29.)

Baez argues that the affidavit did not go far enough in describing how much information he was able to feed to the government, and therefore the issuing judge was not in a position to assess accurately the need for the wiretap. The argument is not persuasive.

First, of course, this is not a situation where the basic fact that there existed an informant close to a target of the investigation was concealed or withheld. The affidavit told the judge who issued the warrant about Baez's relationship to Lopez and gave some information about how his cooperation had helped. The affidavit further disclosed the prior New York wiretap. The issuing judge was thus aware that there were available techniques that might yet be productive, at best to some degree, and was likewise thus alerted to the possibility that a wiretap might be unnecessary. That, of course, is the judgment that the issuing judge has to make: is this wiretap necessary, as the applicant claims, or are the disclosed techniques previously tried sufficient? The First Circuit has said:

> The requirement of a full and complete statement cannot possibly mean that every single detail, even if relevant to the wiretap, must be included. The plain language of § 2518(1)(c) only requires a full and complete statement "as to" the crucial issue: "whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried." Many aspects of an investigation, especially in a large, complex case like this one, will not be relevant to the question of whether a particular wiretap is necessary. And even if there is some relevance, the officer need not detail every single fact, so long as sufficient facts are described as to the crucial issue and material contrary facts are not omitted.

United States v. Yeje-Cabrera, 430 F.3d 1, 9-10 (1st Cir. 2005) (citations omitted). Viewed in this light, the omissions cited by Baez do not run afoul of § 2518(1)(c) because they do not impact the "critical issue."

Moreover, while confidential informants like Baez can provide a good deal of valuable information, there are limitations on what can be expected from their cooperation. Some of these limitations were set forth in Special Agent Drouin's affidavit. Specifically as to Baez, Drouin stated that while Baez (CS-2) had provided information about Cartagena and Lopez, he was not "in a position to testify without jeopardizing several other ongoing investigations." (Sept. 29, 2005 Aff. ¶68.) Nor was he able "to provide sufficient details to reveal the full nature and scope of CARTAGENA and LOPEZ's organization." (Id.) Nor was Baez likely to "be able to infiltrate the organization or provide agents with even a historical view of the scope of the organization's drug trafficking and money laundering activities." (Id.) Even taking Baez's own description of his relationship to Lopez and the kind of information he was able to provide at face value, he was not in a position to provide all the information that objectively reasonable investigators would want or need for a successful prosecution of the several people involved in the distribution network. Drouin was not so much focused on Lopez, but Cartagena and his dealings in the Boston area. Baez was principally useful because of his connection to Lopez, and he was able to provide information about Cartagena was limited only to the extent Cartagena interacted with Lopez. There is no indication, however, that Baez was particularly useful in developing information and evidence about Cartagena's interactions and activities with confederates in the Boston area. It was those activities, after all, that were the focus of the Boston DEA's investigation. It was Cartagena's phone that was the target of the wiretap application, not Lopez's, and though Lopez was expected to be intercepted, so were others thought to be part of Cartagena's Boston distribution operation as to whom Baez had nothing to offer. See United States v. Villarman-Oviedo, 325 F.3d 1, 10 (1st Cir. 2003) ("Even though a

8

New York confidential informant had enabled the agents to identify some of the main co-conspirators, that informant lacked sufficient contacts to develop information about the structure of the organization in Puerto Rico.").

A wiretap is not unreasonable simply because other investigative techniques have produced some results. See United States v. Cao, 471 F.3d 1, 3 (1st Cir. 2006) (noting that just because the government had "partial success" through use of conventional methods of investigation, a wiretap was not unnecessary); Villarman-Oviedo, 325 F.3d at 9 ("We have interpreted [§2518(a)(c)] to mean that the statement should demonstrate that the government has made 'a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls.'…It is not necessary, though, to show that other methods have been entirely unsuccessful.") (citations omitted); Abou-Saada, 785 F.2d at 11 ("[T]he government does not need to exhaust all other investigative procedures before resorting to wiretapping. Nor must ordinary techniques be shown to have been wholly unsuccessful.") (citations omitted). In other words, the necessity requirement does not mean that an investigation must first have ground to a desperate halt before a wiretap can be granted.

Further, apart from the scope of information that might be provided, prosecutors can be legitimately concerned about the evidentiary reliability of that information. After all, the object of the investigation is not only to learn what crimes are being committed but also to develop sufficient admissible, reliable evidence to be able to convince a jury that those crimes were committed by the

9

persons charged with them. Testimony of a cooperating informant can be useful,[2] but it is also subject to impeachment for bias and self-interest, among other things, and as to convincingness, it generally pales in comparison to a recording of a defendant's own voice, speaking *in flagrante delicto*.

In summary, I find that the fifty-nine page Drouin affidavit in support of the warrant application was sufficient. It described the successes and limitations of other investigative techniques. (Sept. 29, 2005 Aff. ¶¶ 65-78.) There is no basis for concluding here that the government deliberately misled the issuing judge in what was affirmatively set forth, and there is further no reason to conclude that any omitted details about Baez's provision of information, if included, would have materially altered the sum of information presented to the issuing judge.

The subsequent three federal wiretap applications similarly satisfy § 2518(1)(c). In each application, Special Agent Drouin's affidavits detailed the various other traditional investigative techniques, and just as in the original federal wiretap application, the subsequent applications also detailed the limited successes of those techniques. (Aff. in Supp. of Application for Authorization to Intercept Wire Communications ¶¶ 75-87, Oct. 20, 2005; Aff. in Supp. of Application for Authorization to Intercept Wire Communications ¶¶ 52-64, Nov. 2, 2005.) Both of these affidavits disclosed that Baez had ceased to be available to agents. By the time of the last application, made on November 18, 2005, the government disclosed that it had concluded it could no longer rely on Baez as an informant, because he appeared to have returned to active participation in Lopez's drug

---

[2] The cooperation has to continue through trial, of course. Here Baez terminated his cooperation and became unavailable either to develop further information or to testify at trial.

organization. (Aff. in Supp. of Application for Authorization to Intercept Wire Communications ¶¶ 59-75, Nov. 18, 2005.)

Based on the extensive discussion of the attempted use of traditional investigative techniques, the government resorted to the wiretaps having made "a 'reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls.'" Villarman-Oviedo, 325 F.3d at 9 (quoting Hoffman, 832 F.2d at 1306-07). Therefore, I find that the applications met the statutory requirements of § 2815(c) and the facts set forth were at the very least "minimally adequate" to support the necessity determination made by the issuing judge. The evidence obtained through use of the federal wiretaps will not be suppressed.

As a final matter, Baez has not made a substantial preliminary showing that the affidavit omitted material facts knowingly and intentionally, or with reckless disregard for the truth, that would have altered the assessment by the issuing court. See Franks, 438 U.S. at 155-56; United States v. Nelson-Rodriguez, 319 F.3d 12, 34 (1st Cir. 2003); United States v. Rivera-Rosario, 300 F.3d 1, 20 (1st Cir. 2002). None of the omitted facts would have been material to the probable cause finding. The request for a "Franks" hearing is denied.

### III.   Duran's Motion to Suppress

Richard Duran seeks to suppress the evidence seized during the execution of a Massachusetts state search warrant for 16 Avon Street in Everett, Massachusetts. The sole argument for suppression is that probable cause for the search warrant was supported by fruits of the New York and federal wiretaps. (Def.'s Mem. in Supp. of the Mot. to Suppress All Evidence from State and Federal

Wiretap Interceptions and All Physical Evidence Obtained from the Execution of the Search Warrant 15.) Since the federal wiretaps were valid, Duran's fruits argument in this respect fails. Nor is there any evidence – Duran suggests none – that any information learned from the New York wiretap was used to apply for the search warrant. Therefore, Duran's motion to suppress the physical evidence obtained as a result of the search must be denied.[3]

### IV. Cartagena's Motion for *In Camera* Inspection of Special Agents' Handwritten Notes

Cartagena requests that I conduct an *in camera* review of the handwritten notes of Special Agents Drouin and Canavan related to "the investigation or investigations" leading to the present indictment.[4] He argues that government agents apparently included information in their personal handwritten notes that they did not include in their formal DEA-6 Reports. The DEA-6s have been furnished in discovery; Cartagena seeks to obtain the notes as well. He argues that the notes may contain information about the extent of Baez's cooperation that was not presented in the affidavits made in support of the eavesdropping warrants. His proposal is that the notes be submitted to me for *in camera* review to see whether there is any basis for their disclosure.

---

[3] In a "Supplemental Memorandum for Motion to Suppress," filed three days after the hearing on the motions disposed of in this Opinion and Order, Duran advanced a new argument: that statements he made to police executing the search warrant should be suppressed because he had not been adequately afforded his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Such an entirely new argument is not appropriately raised in a "supplemental memorandum," and I do not address it. If Duran wishes to present the point, he should file a proper motion to suppress the statements, supported by a proper affidavit, and further make a showing why it is appropriate for the new argument to be entertained at this late juncture in the case.

[4] Defendants Richard Duran, Ernesto Perez, Alexander Serna, Pablo Baez, and Alberto Benval have all moved to join this motion. Those procedural motions are granted. As to the merits, the result is, of course, the same for them as for Cartagena.

Cartagena seeks support for his motion from United States v. Rosario-Peralta, 175 F.3d 48 (1st Cir. 1999), but that case is inapposite. In Rosario-Peralta, federal agents pursuing a boat they had seen dumping cocaine into the sea eventually stopped and boarded a vessel and arrested the defendants. The defendants contended that agents had lost sight of the culprit vessel in the course of the pursuit and had mistaken their boat for the one that had dumped the cocaine. They argued that communications records and logs kept by two land-based communications agencies that had helped to track the drug vessel would contain information about times and locations that would support their contention that their boat could not have been the one that the agents had been trying to track. In other words, the defendants had a defense – essentially mistaken identity – that they argued would be supported by specific objective data in the logs maintained by the communications agencies. The District Court declined to order disclosure of the logs to the defendants. On appeal, the First Circuit remanded the case for an *in camera* review of the logs to see if they arguably did support the defendants' theory and thus were properly discoverable. On remand, the District Court examined the logs, concluded that they contained information that was both material to the defendants' defense, see Fed. R. Crim. P. 16(a)(1)(E)(I) (formerly Fed. R. Crim. P. 16(a)(1)(C)), and potentially exculpatory under Brady v. Maryland, 373 U.S. 83 (1963), but that the defendants had not been prejudiced by the non-disclosure because the information in the logs was cumulative to that in other reports. United States v. Rosario-Peralta, 199 F.3d 552, 558 (1st Cir. 1999). The Court of Appeals affirmed. Id. at 560.

13

The Rosario-Peralta case was concerned with materials that were claimed to fall within the scope express discovery obligations: information material to the defense case and Brady exculpatory evidence. Moreover, there was no doubt that the logs contained time and location data that would bear on the validity of the defense theory; the only question was what the data showed. Neither circumstance is present here. Cartagena does not claim that the agents' notes contain specific categories of information that is potentially exculpatory or material to a defense. Rather, he proposes that they might.

The present case is rather more like United States v. Caro-Muñiz, 406 F.3d 22 (1st Cir. 2005). In that case, a government informant made 140 tape recordings during an investigation of the defendant. The government produced about half of them – apparently those that recorded the defendant in conversation with the informant – and the defendant moved for disclosure of the remainder, "on the basis that they might contain exculpatory or impeachment evidence." Id. at 28. He also asked the District Court to review the unproduced tapes *in camera* to see if they did contain any exculpatory information. The Court of Appeals affirmed the District Court's refusal to review the tapes *in camera,* noting that the case was "easily distinguishable" from Rosario-Peralta, which the defendant had cited. The court said:

> Caro has presented neither a theory regarding the existence of potentially exculpatory evidence on the tapes, nor has he made any showing that the tapes would be of substantial assistance to his defense. His discovery request to the district court only stated that "[t]he recordings not provided in discovery *may* contain evidence that exculpates the defendant." . . . This is precisely the type of fishing expedition that Brady does not permit. Caro identified no particular tape of specific interest and has provided no basis for this court to conclude that any recording contained potentially favorable evidence. In the absence of a particularized and focused request, the district

14

> court is not required to troll through voluminous recordings in search
> of potentially exculpatory evidence.

Id. at 29-30 (emphasis in original).

Cartagena surmises that agents might have notes that give greater detail about how helpful Baez's cooperation was to their investigation, but that is not a "particularized and focused request," nor is it one that goes to the central issue in the case – the defendant's guilt or not – as might have been the case in Caro-Muñiz. It seems unlikely that the Court of Appeals, having refused to require *in camera* inspection of the audio recordings in Caro-Muñiz, would require *in camera* inspection of the agents' notes here.

More fundamentally, however, I have already assumed that the agents could have put in the affidavits more details about Baez's activities and possibilities as an informant close to Lopez. But I have also concluded that the additional details would not have materially altered an assessment as to whether investigative techniques other than eavesdropping – specifically reliance on Baez – "reasonably appear to be unlikely to succeed" in achieving the full objectives of the investigation. See 18 U.S.C. § 2518(c). Even if Baez had been able to give agents virtually a daily diary of Lopez's guilty words and deeds and they wrote it all down in their notes, that still would not have affected the need to develop other sources and investigative techniques to understand the who, what, where and when of Cartagena's operations with others than Lopez in the Boston area. So, more important than the process objection *a la* Caro-Muñiz – Cartagena's request is not focused and particularized – is the substance objection – there was more being investigated than Lopez and the inadequacy of Baez's information as to the broader investigation was apparent and unchallenged.

15

**V.      Conclusion**

In conclusion, Baez's motion to suppress (dkt. no. 153) and his associated request for a Franks hearing, Duran's motion to suppress evidence obtained during the execution of a search warrant for 16 Avon Street (dkt. no. 167), and Cartagena's motion for *in camera* review of the government agents' notes (dkt. no. 306) are all DENIED.

It is SO ORDERED.

    /s/ George A. O'Toole, Jr.
United States District Judge